UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BRODERICK V. BULLOCK, SR., | |
| Plaintiff, | |
| v. | CAUSE NO.: 3:19-CV-081-JD-MGG |
| HYATTE, | |
| Defendant. | |

OPINION AND ORDER

Broderick V. Bullock, Sr., a prisoner without a lawyer, is proceeding on a claim for injunctive relief against Warden Hyatte in his official capacity related to injuries he sustained on February 2, 2019, after he was attacked by a fellow inmate at the Miami Correctional Facility. ECF 4. He has filed two motions requesting immediate injunctive relief. ECF 23, 25. The court ordered the defendant, Warden Hyatte, to file a response to the motions, including affidavits and/or medical evidence if necessary, only to the extent Bullock alleges that medication or treatment related to his eye injury is currently being withheld. ECF 26. Warden Hyatte has done so (ECF 34), and Bullock has filed his reply (ECF 37).

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). To obtain a preliminary injunction, the moving party must show (1) he will suffer irreparable harm before the final resolution of his claims; (2) available remedies at law

are inadequate; and (3) he has a likelihood of success on the merits. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015). The court then "weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

An injunction ordering the defendant to take an affirmative act rather than merely refrain from specific conduct is "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quotation marks and citation omitted). Before Bullock can obtain injunctive relief, he must make a clear showing that the medical care he is receiving violates the Eighth Amendment prohibition on cruel and unusual punishment. *See Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Bullock, like every inmate, is entitled to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). However, "the Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Inmates are "not entitled to demand specific care [nor] entitled to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Indeed,

> medical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Jackson v. Kotter*, 541 F.3d 688, 697-98 (7th Cir. 2008) (quotation marks and citations omitted).

Bullock's main complaint is that he is not receiving adequate care for his right eye injury. It is undisputed that, since the injury occurred on February 2, 2019, Bullock's eye has been examined and treated by multiple medical professionals including an optometrist and an outside ophthalmologist. *See* ECF 17 at 3–4 (summarizing the medical record). However, Bullock now alleges that prison officials are failing to follow the recommendations of those specialists and are withholding medication in the form of "serum tears" that were prescribed by Dr. Stephen M. Johnson from the Midwest Eye Institute on March 25, 2019. ECF 23 at 1; 25 at 2; *see also* ECF 22-1. Warden Hyatte, by counsel, has responded as follows, claiming that Bullock's request is moot:

> Plaintiff is currently receiving preservative free artificial tears. With regards to Plaintiff's request for serum tears, there is no live controversy remaining. *Brown v. Bartholomew Consol. School Corp.*, 442 F.3d 588, 596 (7th Cir. 2006.); *See Honig v. Doe*, 484 U.S. 305, 317, 108 S. Ct. 592, 98 L.Ed.2d 686 (1988). Wexford of Indiana medical staff have been coordinating with Dr. Stephen Johnson at Midwest Eye Institute and staff at Midwest Cornea Associates and it was noted on May 15, 2019, that while "there isn't an alternative to serum tears[,] [t]he patient should use preservative free artificial tear[.]" As an alternative to the treatement [sic] demanded by Plaintiff has been provided, the issues raised in his request for preliminary injunction are now moot.

ECF 34 at 4. The court disagrees with both the characterization of the evidence in the record and the conclusion that the request for preliminary injunctive relief is moot.

Treatment notes from Bullock's March 25th visit to Dr. Johnson indicate the following:

3

> Serum tears will help *heal* the ocular surface. This may represent a logistical problem. *In the meantime* preservative free artificial tears is advised. Stem Cell Dysfunction OD. Stem cell transplant is not indicated. Discussed autologous serum eye drops. Factors within the serum can lead *to healing* of the eye's surface. Central Corneal Opacity OD. The scar *does* impact vision. However *over the next several months* it can lessen. At some point spectacle correction may be helpful.

ECF 34-1 at 75 (emphasis added). Dr. Johnson went on to prescribe both serum tears and preservative free artificial tears. *Id*. On May 15, 2019, in response to a query from Wexford of Indiana, Dr. Johnson's office faxed over the aforementioned treatment notes, confirmed that "there *isn't* an alternative to serum tears," and stated that Bullock should use the preservative free artificial tears. ECF 34-1 at 74 (emphasis added). An email from Lee Ann Ivers of Wexford of Indiana dated June 10, 2019, states that the serum tears, which are "made out of the patient's blood" and need to be "put on ice and transported to Indianapolis" can "only be purchase[d] from the Midwest Cornea Associates." ECF 34-2. The transportation issue is apparently not prohibitive, however, as the email continues, "[w]e were going to go ahead and do this, but they would not take a check or company card." ECF 34-2. The artificial tears were purchased from CVS, and Bullock is currently receiving them. *Id*.

Although the Warden claims that the matter is now moot because an alternative to the serum tears has been provided, the record belies that assertion. Dr. Johnson's office confirmed that there is <u>not</u> an alternative to the serum tears, which were prescribed to help heal Bullock's eye. Based on the record before the court, it is clear that Dr. Johnson intended the artificial tears to be a temporary measure pending the resolution of any logistical problems rather than a final, definitive treatment. Despite

4

this, the Warden's response indicates that there are no plans for implementing Dr. Johnson's full recommended treatment course now or in the future. Indeed, the Warden has provided no evidence that any of the "logistical problems"[1] are being addressed, nor does he present a medical professional's opinion that differs from that of Dr. Johnson—a specialist who was specifically selected by Wexford and/or prison officials to treat Bullock's eye. Thus, the matter is not moot.

Turning to the merits, the Warden argues that Bullock has failed to establish a likelihood of success on his Eighth Amendment claim because he is continuing to receive care from Wexford and is being provided with artificial tears. But, as noted above, the fact that Bullock is receiving artificial tears is not dispositive. Bullock has been diagnosed with neurotrophic keratopathy, a rare degenerative disease, in his right eye,[2] and it is undisputed that his vision is significantly impacted by this condition. Dr. Johnson has prescribed serum tears, but Wexford is refusing to provide them and has not presented any evidence of a reasonable, long-term alternate plan. Although the Warden states, correctly, that as a non-medical professional he may reasonably defer to the judgment of medical professionals regarding inmate treatment, the evidence suggests that he is not doing so here as Dr. Johnson's full recommendations are not

---

[1] According to the email from Ms. Ivers, the only identified remaining logistical problem is with the form of payment.

[2] "Neurotrophic keratitis (NK) is a degenerative disease characterized by corneal sensitivity reduction, spontaneous epithelium breakdown, and impairment of corneal healing. . . . Early diagnosis, severity-based treatment, and careful monitoring of NK patients are mandatory to achieve epithelial healing and prevent progression of corneal damage, especially since worsening of NK is frequently asymptomatic." Marta Sacchetti and Alessandro Lambiase, *Diagnosis and Management of Neurotrophic Keratitis*, U.S. National Institutes of Health's National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3964170/ (last visited July 3, 2019).

being carried out, and the Warden has not provided an adequate reason as to why. Similarly, while it is generally true that an inmate is not entitled to demand specific services or the best care possible, it was Dr. Johnson who prescribed the serum tears in this case, not Bullock.

The Warden also argues that Bullock has not shown that he lacks an adequate remedy at law because Bullock is "not precluded from bringing suit against the medical staff treating him." While it is true that Bullock *could* sue those medical professionals, it is not necessary for him to do so to obtain injunctive relief because, ultimately, William Hyatte, as the warden of the Miami Correctional Facility, has both the authority and the responsibility to ensure that Bullock receives the medical treatment to which he is entitled under the Eighth Amendment. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

Additionally, the Warden argues that Bullock has not established he will suffer irreparable harm absent a preliminary injunction. However, the evidence shows that Bullock is experiencing continued pain and impaired vision in his right eye due to diagnosed neurotrophic keratopathy. Neurotrophic keratopathy is a progressive, degenerative disease that can worsen without appropriate treatment.[3] The serum tears prescribed by Dr. Johnson on March 25, 2019, have still not been provided to Bullock.

---

[3] "NK can be classified according to severity of corneal damage, ie, epithelial alterations (stage 1), persistent epithelial defect (stage 2), and corneal ulcer (stage 3). Management of NK should be based on clinical severity, and aimed at promoting corneal healing and preventing progression of the disease to stromal melting and perforation." Marta Sacchetti and Alessandro Lambiase, *Diagnosis and Management of Neurotrophic Keratitis*, U.S. National Institutes of Health's National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3964170/ (last visited July 3, 2019).

While it is true that Dr. Johnson indicated the artificial tears could be used "in the meantime" pending a solution to any logistical problems, more than three months have passed since that time. Absent evidence to the contrary,[4] this is an unreasonable delay. Thus, Bullock has sufficiently established he is experiencing irreparable harm pending the resolution of this lawsuit.

The court must also weigh the competing harms to the parties if an injunction is issued. The Warden argues that "[a]llowing every inmate to petition the court for specific medical care to be provided, despite a physician acknowledging that alternative treatments are available, would create a dangerous precedent." As set forth ad nauseam above, no physician in the record has stated that there is an alternative to serum tears. While it is possible—indeed, even likely—that different treatment options for neurotrophic keratopathy exist, the Warden has provided no evidence of them. As to financial considerations, if the injunction is granted, costs will be incurred, although they are not considerable.[5] However, if injunctive relief is not granted, then it appears likely that Bullock will continue to suffer eye pain and possible worsening vision loss. The public interest is not substantially affected by the expense that will result from the issuance of a preliminary injunction, because the injunction would essentially require

---

[4] Although the Warden has indicated he believes the need for serum tears is moot, the record currently before the court shows otherwise.

[5] A document from Midwest Cornea Associates states that the costs include an unspecified lab fee (blood will need to be drawn and processed) and an apothecary fee (ranging from $125 for a 1 month supply to $170 for a 1–2 month supply). ECF 34-1 at 60.

7

the Warden do only what the Eighth Amendment already requires—provide Bullock with adequate treatment for his serious medical condition.

Finally, because Bullock is a prisoner, there are additional considerations to consider under the Prison Litigation Reform Act (PLRA).

> The PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.

*Westefer*, 682 F.3d at 683 (quotation marks, brackets, and citations omitted). Bullock has requested that he be provided with the serum tears prescribed by Dr. Johnson. It is both appropriate and narrowly tailored to require the Warden to ensure that a qualified physician's prescription recommendations are followed, especially when no evidence of a differing medical opinion has been proffered. The court is not mandating that Warden Hyatte to do anything requiring a medical degree—he is only required to ensure that the existing prescription recommendation of the specialist selected by Wexford to evaluate and treat Bullock is carried out.

For these reasons, the court:

(1) GRANTS the motions for preliminary injunctive relief to the extent they request that the serum drops prescribed by Dr. Stephen M. Johnson on March 25, 2019, be provided to Broderick V. Bullock, Sr., (ECF 23, 25);

(2) ORDERS Warden Hyatte to make arrangements to provide Broderick V.

8

Bullock, Sr., with the serum drops prescribed by Dr. Stephen M. Johnson on March 25, 2019, by no later than **July 15, 2019**; and

(3) ORDERS Warden Hyatte to provide the court with adequate documentation by no later than **July 15, 2019,** that Broderick V. Bullock, Sr., is receiving and will continue to receive the serum drops for the duration of the recommended treatment course as directed by Dr. Stephen M. Johnson.

SO ORDERED on July 8, 2019

/s/ JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT